CIGNACorp is a non-profit organization based in New York City, United States. CIGNACorp is a non-profit organization based in New York City, United States. May it please the Court, my name is Robert Glesko. I'm with the law firm of Wilson Elser. May it please the Court, my name is Robert Glesko. I'm with the law firm of Wilson Elser. And I am here representing the appellants, Connecticut General Life Insurance Company, which I'll refer to as CIGNA, Alcatel-Lucent USA, or Alcatel, and the Long-Term Disability Benefits Plan for management or LBA employees. May it please the Court, also I would like to reserve five minutes for rebuttal. That's granted. Thank you, Your Honor. Your Honor, this appeal involves a claim for long-term disability benefits under an employee benefit plan, which was established, funded, maintained, and administered by Alcatel-Lucent USA, which is formerly Lucent Technologies. CIGNA is the claim administrator for the plan only. It does not pay benefits or is not responsible for the payment, fiscally responsible for the payment of benefits under the plan. Therefore, there is no conflict of interest. That is, CIGNA does not operate under a conflict of interest. Yet the Court found there was, right? Yes, Your Honor. It's not clear to me why, Your Honor, because there was no contention either here or before the district court below that there was a conflict of interest. Do you have any idea what led to that assertion by the district court? No, frankly, Your Honor. I mean, an idea would be pure speculation. I'm making a pretty good argument. Well, don't speculate. So the consequence of that error is what? The consequence, Your Honor, is we believe that the district court's review of the underlying claim determination was painted or colored by that misapprehension regarding the conflict of interest. Well, but there's multiple factors to be considered here, right? I mean, it's not your point that it's a sort of bright-line test. If they get this wrong, that's it. It's got to go back, per se, right? That's correct, Your Honor. There are multiple factors. Under MetLife v. Glenn, which the district court appropriately cited or would have appropriately cited had there been a conflict, the conflict would be a factor, and the degree to which that factor would be relevant would depend upon the significance of the conflict, that is, whether or not Cigna was actually influenced by the temptation for self-dealing.  Which may be reviewed to ascertain, and stacked up sort of to ascertain whether or not the underlying claim determination was without reason because the factors might be so heavily weighted. However, the factors in Glenn also go to determine the significance of the conflict, and I think that is how the district court below misunderstood the standard. For example, if one were to look at an award of social security disability benefits, that, of course, is a factor to be determined or to be evaluated in whether or not the claim determination was actually reasonable. In the case of a claim administrator operating with a conflict, the failure to expressly state why the social security administration decision was or was not credited might go to increasing the degree of conflict, and therefore tipping the scales in favor of an arbitrary increases review. That's not what happened. Help me out, Mr. Lesko. In response to Shigeru's question, is your position that if it was error, and we know you're asserting it's error, for the district court to say, hey, there's a conflict here, that that by itself means the case has to go back? And if that's not what you're saying, I have another question for you. Your Honor, that's not what we're saying. May I clarify? Yeah. What we're saying is, firstly, this court exercises plenary review, of course, and therefore it's not that the decision below is irrelevant, but this court gets to look at the record all over as though there was no decision below. And we submit that if this court does that and weighs the factors, this court will see that there is substantial evidence. That is, evidence upon which reasonable minds could find that signal was correct, even if it's wrong. Of course, the district court said you didn't follow your own plan, and that was highly problematic. What's your response to the district court's assertion that you were obligated, by the terms of the plan, to make some kind of an assessment to figure out whether he could earn 60% of what he had been earning before? I think it's a vocational analysis, right? You were obligated to do something, and you did nothing. Your Honor, there again, we respectfully disagree with the district court below, and here's why. This plan, the definition of disability, has two parts. Within the first year, the participant is only disabled if they are found to be disabled from their own occupation, even if the participant can do another occupation. Right, and I don't think anybody argues that there was a problem with Phase 1. It's all about Phase 2 here, right? Right, so in Phase 2, the question is whether or not they can perform any occupation for any employer, and if they can, they're not disabled, provided that that occupation they're found to be able to perform would provide at least 60% of predisability pay, eligible pay. In this case, Cigna found during the second phase that, hey, Mr. Funk's limitations, not to say anything about the diagnosis, but the limitations imposed as a result of the condition are no longer severe enough to preclude him from doing his occupation with LUCID, any occupation for any employer, including his occupation for LUCID. So if he could perform his occupation for LUCID predisability, then by definition, logically, he must be able to earn at least 60%, in fact, 100% of his predisability income. So we found that he was not totally disabled under even the more restrictive standard during the first year, more restrictive in Mr. Funk's favor, that is. So you're relying on Dr., is it, Quiam's opinion, right? I mean, he's the one who said Funk could work in a supportive, low-stress environment, but there was still no vocational analysis. And also, didn't Dr. Quiam also say he deferred a vocational expert, which, of course, never materialized? I don't think that, respectfully, Ronald, that's a fair reading of the record. Now, there was a peer-to-peer review between Dr. Quiam and Dr. Pinchuk, or Quiam. I'm not quite sure how to pronounce that. There was a peer-to-peer review, which was recorded by way of sort of notes, a narrative by Dr. Quiam. And he said, in response to Dr. Pinchuk's suggestion that Mr. Funk couldn't even mop floors, he said that he could probably perform low-stress, low-cognitive demand. In other words, he could mop floors, but that's irrelevant. And then Dr. Pinchuk suggested, and this is where there's evidence of attending physician bias as an advocate. He said, oh, yeah, but that doesn't meet the 60% salary requirement in the plan. That's where Dr. Pinchuk said, well, I'll leave that to the experts. But ultimately, that was just an interim conference between the two doctors. That was not the basis of the decision. Ultimately, Dr. Quiam and, more importantly, Cigna, the claim administrator, determined that Mr. Funk could perform his occupation and, therefore, no vocational analysis was required. It wasn't room for some occupation. It's a part of the issue that the district court came up with in analyzing this, is that the district court queried what was different in the information available to Dr. Quiam that led to a difference in the ultimate conclusion from what Judge Chigares just read you to the determination that Mr. Funk could, in fact, do his own job. And that was a major part of the reason for the court's conclusion. Your Honor, what Judge Chigares just read to us was not a determination by Dr. Quiam. That was merely a narrative in a peer-to-peer review. No, his ultimate determination was that, his determination after initially finding limitations, was that his condition or the limitations relating to his condition had changed so that they were no longer severe enough to limit him from performing the requirements of his job. But my question is this. There must have been something that the doctor saw to come to the conclusion that he would, that he, Mr. Funk, would be able to work in a low-stress environment, at least, you know. I don't have the exact words right in front of me, but I know the court I'm talking about. I do. And my question is, what is there in the record to help us in reviewing this, that there was a substantive difference in the information provided between Dr. Quiam coming to that conclusion that a low-stress environment would work for Mr. Funk at whatever point in time that was, and then his ultimate conclusion that he indeed could work at his old job and function properly in that job? I understand your question, Your Honor. It's essentially what changed in his condition. Yes. But the question I perceive, I think correctly, is based upon a misunderstanding as to what Dr. Quiam's initial determination was. I'm sorry. I've got that tune in my mind now. I like country westerns. My sincere apologies. You'd all be in trouble for that. Everybody else checks their phones. Your Honor, may I continue? Yes. Could you start again, please? Sure. I think I understand your question. Yes. You're asking me what changed in the limitations so that, you know, from the initial opinion of Dr. Quiam to say that he's severe from a severe psychotic episode and can't work, to then saying he can work. But your question, as part of your question, you state that, and I don't think, I think it's incorrect. Dr. Quiam never concluded that Mr. Funk could only work in a low-stress supportive environment. That was just a note, a passing note in a conversation. The ultimate determination, the initial determination of benefits, that is, and the ultimate appeal, which is really the most relevant here, but that determination was based upon a finding that Mr. Funk could perform his occupation, not a low-stress cognitively supportive job. It was his job. Now, here's what changed, your Honor. What changed was Dr. Quiam found that he no longer suffered from severe symptoms. It was the severe symptoms which led to the impairment from performing his occupation. For example, the records demonstrate, and Dr. Quiam notes, that the records show Funk is not suffering from severe symptoms. For example, he no longer is drinking alcohol, that resolved. He no longer is manic or psychotic. Dr. Pinchot told him that during the peer-to-peer review, which is at page 220 of the appendix. In addition, the symptoms, I mentioned he's not using alcohol. He was now diagnosed with bipolar disorder. However, there was no information, no notes to support the diagnosis during the relevant time period. There was no information regarding the extent of the symptoms provided by Dr. Pinchot. But what we did note, or Dr. Quiam did note, was that Mr. Funk was no longer manic or psychotic. He was only depressed. Now, Dr. Pinchot said severely depressed, but Mr. Libby, who was the therapist who saw him more often than Dr. Pinchot, said that the depression was under control. But Libby, as well as Pinchot, the Social Security Administration, and others, all came to similar conclusions, that is that he couldn't work. Your Honor, repellents submit that that conclusion is unreasonable. Or, if not unreasonable, it's not supported. More importantly, the contrary evidence is sufficient upon which reasonable minds can find that signal. Is there a point where your client then gets some sort of independent medical examiner or at least a vocational expert involved to help explain the change in direction? Yes, Your Honor. SIGMA did do that. In fact, you've got a medical examiner, you've got Dr. Shipko involved, but you never got a vocational expert in there to say anything about whether this man could work or what kind of environment he could work on. I mean, if I understand the record right, you had a neuropsychologist, you didn't, but Dr. Panza saw him for a day, did some tests, and then you had Dr. Kame and Dr. Shipko, who never saw him but reviewed some records, make some comments. That was the limit of the investigation, and based on that, said, well, we think you can still do your job. If I got the record right? Respectfully, Your Honor, I don't think that's a fair characterization of the record. For one thing, Dr. Panza was a neuropsychologist. He did a two-day exam. He administered 20 objective tests, and almost all of those tests showed a high level of cognitive function without any impairment based upon mood disorder, depression, anxiety, or anything like that. Now, I ask rhetorically that if SIGNA had hired Dr. Panza to do that examination, would we be standing here? The fact of the matter is that Mr. Funk's own attending physician hired Dr. Panza to do that analysis, and it fully supports the denial. Dr. Shipko did much more than just look at some records and make some notes. Dr. Shipko did a detailed analysis, and if you're honest... When you say a detailed analysis, what do you mean? When I said he reviewed the records, that wasn't an insult. I'm just saying that's what he did. He never examined Mr. Funk. He looked at the records, right? That's correct, Your Honor. Okay. An examination was done. I didn't take it as an insult. I just wanted to make sure. You may sound like, well, it was a really detailed analysis. Yeah, I'm sure he did a good job for you. That's not my implication. What I'm saying is the district court appeared to take the view that this was a decision that was made in the face of the Social Security Administration's decision, in the face of his treating physician, in the face of his treating psychotherapist's opinions, and that in light of those things, this was not enough. But your position, I take it, is clearly it is, right? Clearly it was, Your Honor, and as I'm sure the court has already done, a review of Dr. Shipko's report shows that he specifically addresses various points raised by Dr. Hinchoff and Dr. Libby, and it is point by point. It's not just the willy-nilly acceptance of Dr. Shipko, and also the notes in the file, the claim notes in the file indicate that the claim reviewer from CIGNA considered all of that. Thank you. Thank you, counsel. Good morning. May it please the Court, Stephen Gector on behalf of Ali, Robert Funk. Your Honors, I'd just like to address one of the questions that was raised about Dr. Kayyem's opinion. I noted that counsel indicated that it was simply a passing reference in some peer-to-peer review report. That's not the case here. CIGNA adopted his decision, his opinion, in their first denial of August 22nd, 2006. It's at page 359 of the appendix. And that indicates, while we respect Dr. Hinchoff's opinion that he feels you are unable to work, and I'm quoting directly from the decision of CIGNA, which is being reviewed here, there is no clinical evidence to support that you would be unable to work in a supportive, low-stress, low-cognitive-demand environment. That was the basis of their decision. Is that the decision that we're reviewing? You just said that's the decision we're reviewing. But aren't we reviewing the last, the final decision? There was another appeal after that, right? That's correct, Your Honor. And every appeal within that administrative system is de novo, right? Yes, but I think this points to the procedural irregularity here of how they approach this entire case. I think the case law indicates— Before you go there, help me out with this. Is it or is it not the final decision that we are reviewing?  So if they had come to a decision on entirely new evidence that was clearly sufficient in their last step, you would say it's still reversible if they made a mistake in an earlier step? If there was some entirely new evidence that came up. But what had happened here, I'd like to put it into context about the process, because in these ERISA review cases, when you're looking at the arbitrary and capricious standard, it is about the process and how they arrived at the final decision. I agree the final decision is what's reviewable, but we need to put it into context. Cigna first terminated Mr. Plunk's benefits on the basis of their determination, which is clearly stated in their denial, that he could work in a highly supportive, low cognitive demand, low stress environment. They didn't address their definition of disability. Mr. Plunk engages counsel and engages in an appeal. And on his appeal he argues to Cigna, hey, you didn't follow your definition of disability. Your definition of disability requires that I earn $47,000 a year in an occupation. There's no analysis of whether you could do a regular occupation, any occupation, or earn $47,000. So he points this out to Cigna. Cigna, instead of addressing the vocational issues, instead of addressing the Social Security finding, instead of addressing their original paper reviewer's finding, simply sends it out to another reviewer. Well, when Cigna sends it out to another reviewer, is that not something they're entitled to do? Is that a wrong thing for them to do? Absolutely not. They can send it out to another reviewer, but they didn't address Mr. Plunk's appeal. What they did was simply get another medical reviewer, a non-examining expert, to say something totally different. He has no restrictions. Therefore, he can do anything. And if, under our standard of review, if they have a medical expert who says he can do, he can work without restriction, and therefore they say, well, you can go back to your old job, is there a logical flaw in their assertion that that does meet the 60% requirement? Yes, there's definitely a flaw because they failed to reconcile two of their own consultants' opinions. I mean, what you have is the treating doctor saying one thing. I think even if we disregard the opinions of the treating physicians in this case, if you boil it down, we have two medical experts hired by Cigna who differ as to the extent of Mr. Plunk's restrictions. Assume that's right. What's our standard of review? Is it not that they have substantial evidence to support their position? That's correct, but the decision has to be reasonable. So if they've got somebody that says what they say the person says, are they entitled to rely on that? Not if it can't be reconciled with their first expert, and I think that's my point here, is that here you have a divergence of opinion. In fact, even in their, I believe in their reply brief at page 8, they indicate Dr. Shipka was under no obligation to even discuss Dr. Kayan's differing opinion when they're discussing our burden of proof. The procedural irregularities and anomalies are something that are looked into in an ERISA LTD test that's reviewed determination by the court. It's not just simply substantial evidence. It's also whether they reasonably proceeded here, and there's numerous evidence, there's numerous instances in this record under Glenn other than the financial factor. We did not raise the financial conflict. It was thrown into the opinion. It was a one-sentence decision, but we think this court can exercise plenary review and look at Judge Hochberg's decision here and see that she relied on at least five or six other factors. How would that play out? How would that play out? Do you concede first that there's not a conflict here? Yes. Okay. So if there's a weighing process going on here post-Glenn, and one of the factors, and clearly an important one is whether you've got a conflict or not, and she says there is, and everybody in the case agrees there's not, is that in and of itself enough to say, well, we don't know how you would weigh this if you didn't have a false factor in the mix? You've got to look at this again. Well, the court has plenary review of this case, Your Honor, and I think it serves no useful purpose, and I think it can also look at Judge Hochberg's decision and see that she is very well thought out on all of the other factors under Glenn. The financial conflict was just thrown in basically in one sentence in a footnote. However, there are numerous other instances. The reversal of a benefit's determination without additional evidence, disregarded opinions relied on, self-serving selectivity in the use of evidence, and self-serving paper reviews of the medical problems. So I think Judge Hochberg considered many things that this court could ignore the financial issue and still say that this decision is arbitrary and capricious under post-Glenn factor analysis. Can I ask you about Sara Boss? Yes, Your Honor. It's the counterclaim. Right, it's the counterclaim issue. Yeah, sorry. The counterclaim she gave summary judgment to folks on as well, the Nanny Bears, and said that she actually cited Sara Boss, but I was curious about how that applied to her. It appeared to me that the Supreme Court was actually distinguishing the Knudsen case and in effect saying in that case they just didn't plead it right. In this case, it doesn't matter. Now, I'm paraphrasing what I understand the holding could be in asking you to respond. It doesn't matter that the monies aren't in the hands of the plaintiff at the time that the insurance company says, I want to get reimbursed, and it doesn't matter whether the monies leave the insurance hands. It's enough that there's an identified sum of money that's agreed upon by the parties pursuant to their earlier contract in order to require them as an equitable matter to reimburse. Now, that's how I thought Sara Boss was coming out, and I'm asking you to tell me whether you agree or disagree, and if you disagree, why. We disagree. We disagree. Sara Boss still required that there be a fund, and in fact, in Sara Boss, it was a reimbursement claim for medical benefits paid by the Canarissa plan where the monies were being held in an attorney's trust account. Wait, isn't that the Knudsen case where it was held in a trust account? I think Sara Boss indicated it was held separately. I thought there was a personal account there. It could be wrong. In any event, the court said the requirement was not met in Knudsen because the funds to which petitioners claimed entitlement were not in Knudsen's possession but had instead been placed in a special needs trust, and that was a basis on which they distinguished Knudsen and said that's different here. We're not talking about equitable restitution, though. He was talking about equitable restitution. He says here we're talking about something different. We're talking about pursuant to an agreement, an equitable lien by agreement. Well, actually, the counterclaim is based on equitable restitution. That's the words used in Signe's case. But your client, I mean, the funds didn't go into your trust account, I assume, right? No, they did not. They did not. In fact, Mr. Funk was represented on the Social Security appeal by Signe's own subcontractor, Advantage 2000. It was not represented by me to that extent. So your argument is Knudsen applies, not Saraboff. Yes, Your Honor. We also rely on a lower court case, Reichert v. Liberty Mutual, I believe. It's a New Jersey District Court case. Let me ask you this question. If I understand you correctly, the procedural anomalies are so great that even if Mr. Lesko argues that our view of the medical evidence before us is there's substantial evidence to conclude that he's not disabled, your argument is the procedural anomalies essentially outdistance all of that so that, in your view, we can affirm on the district court's determination of arbitrary interpersonal abuse. Well, that's correct to the extent that the standard really is substantial evidence, unreasonable, or clearly erroneous. We're arguing that there was a lack of substantial evidence supportive of Signe's decision. But the courts have held that you just don't look at the end result. You look at the procedure implemented. I'd just like to say a few words on the neuropsychological evaluation that has been put on a pedestal here. That neuropsychological evaluation was correctly, I think, dealt with by the district court below. Number one, cognition was never an issue in this case. Dr. Caillou, when he first approved of this claim, indicated that Mr. Funk's cognition was intact. If you look at the DSM-IV, the Diagnostic Statistical Manual, it lists cognition as only one of nine symptoms to be considered when we're analyzing whether a person has objective evidence of a depression. You look at hopelessness, helplessness, suicidal thoughts, paranoia, all of which the treating doctors indicate Mr. Funk exhibited. So it's not just cognition. I think they're taking and providing undue reliance on that single evaluation. They are entitled to rely on it, though, aren't they? Yes, but it doesn't stand for the proposition that he's not disabled. I think they were taking it for the proposition that he was not cognitively disabled, then relying on Dr. Shipko to say he wasn't sufficiently depressed. Is that not how they were dealing with it? That's correct. But we would submit that Dr. Shipko's opinion doesn't bother to reconcile with his previous consultant, Sigler's previous consultant, and that's where the fault lies. Changing gears just a little bit, I mean, there's no general duty to conduct a vocational analysis before making a decision, is there? That's a correct statement of a lawyer, Your Honor. Okay. So why in this case was it a mistake? Because there's no substantial evidence supportive of their determination. It goes to the substantial evidence standard. The plan says you must be able to earn $47,000 a year given your restrictions, and there was no evidence of that here, particularly in light of the fact that their reviewer said he can only work in a highly sheltered type of workshop. Yes, but I guess the question is, isn't it within their purview to change their mind? And if they change their mind, why would they still be required to make the vocational determination? Well, they changed their mind based on they picked and choose between two of their consultants. One consultant says he has what seemingly would be significant and very disabling restrictions of having to work in a sheltered workshop, and then they just ship it out to another consultant until they find a consultant that says, yeah, he's got no restrictions. Well, no, I thought my point was slightly different. If we believe that Dr. Cleum at a point in time said he would excel in a low-stress environment and that at another point in time, subsequent to that, Dr. Cleum changed his mind, then his subsequent decision and the decision of Dr. Shipko are not at odds. That's correct, but Dr. Cleum didn't change his mind. They just sent it out to Dr. Shipko. Well, Dr. Cleum saw him at two different floors, not saw him reviewing the case at two different points in time, right? That's correct, when he was initially approved and when he was terminated 11 months later. In response to Mr. Lesko's assertion that the comment about low-stress environment, that was something that came up in the course of Dr. Cleum's peer-to-peer discussion with Dr. Pinchuk. It wasn't part of his ultimate decision. It was part of Cigna's ultimate decision.  So it's not so much that there's a conflict between Dr. Cleum and Dr. Shipko as it's a conflict between Cigna's expressed reason on its first decision and its reasoning on its second. But they're based on two different medical opinions and solely based on that. So your association with Dr. Cleum never changed his mind. The only time he expressed a view was in that peer-to-peer conversation, call it whatever. That's correct. It was expressed as he indicated that I was having a telephone conference. Dr. Pinchuk said, I don't think he can work. And I said to Dr. Pinchuk, I'm paraphrasing, that I think he could work in a supportive low-stress environment. And that was put into Cigna's decision. That's what they hung their hat on here on their initial decision. That rather than address Mr. Funk's appeal and get a vocational analysis, they sent it out to another expert who gave them a decision that they ultimately relied on. Thank you, Your Honor. Thank you. Your Honor, I would like to pick up the discussion with the notion that Cigna's ultimate decision or even its initial claim termination was based upon the ability to perform in a low-stress, cognitively supportive environment. First of all, I think the Court understands that is not the relevant inquiry. That is not the relevant point in time for this Court to consider. The relevant inquiry is whether or not Cigna's final claim determination was arbitrary and capricious or conversely, whether it was reasonably supported by substantial evidence in the record, Your opponent here says you can't make that judgment just looking at the last decision. You have to look at the whole process in order to put that in context. What's your response? My response, Your Honor, is that the final decision is the relevant decision. And if that decision is at least reasonably supported by the record, then the decision must be left unserved by the Court under arrest and discretionary review. The process is not irrelevant. The process may be relevant. It's most relevant in circumstances where there would be a conflict of interest to ascertain and instruct the Court as to the level of the conflict or the level of the self-dealing influence under which the claim administrator is dealing. But back to the point, while Cigna's claim reviewer did note that statement in the initial letter, initially terminating the benefits, that was not the final word on the subject because about a week later, Cigna received Dr. Panza's report. Again, it was a two-day, in-depth evaluation by his attending physician. After reviewing that report, after Dr. Kayham reviewed the report, he issued a supplemental opinion, which is found on page 85 of the Joint Appendix. And if I may, Dr. Kayham's opinion was that, he said, my opinion or the neuropsychological evaluation further supports my opinion that there is no evidence of psychiatric or cognitive functional impairment to preclude the claimant from work capacity. Testing also indicates that the claimant had a moderate level of depression which should not preclude him from work capacity. And then Cigna issued a further letter explaining and clarifying. Excuse me, what page were you just reading from? I'm sorry, it was Joint Appendix 85, Your Honor. It's the title that takes follow-up tasks, general follow-up, and that's an entry by Dr. Kayham. So is the assertion that there's a conflict between the two experts that Cigna put in the mix here, is that contention false? Well, it's mistaken, Your Honor. Let's put it this way, we don't agree with it. Dr. Kayham stated that Mr. Funk could work. And in a letter dated August 22nd, I'm sorry, in a letter dated September 15th, Tiffany Ackerman, the disability claim manager, indicates that the information referring to Dr. Penn's report was reviewed in one of our nurse case managers on staff. She doesn't mention Dr. Penn, but clearly he looked at it too. And she says, it does not change our prior decision, this is a quote, it does not change our prior decision, and that prior decision being, you are capable of performing occupational activities. I'm sorry, I don't know that I gave you the page, Your Honor. I beg your pardon. That's page 215 of the Joint Appendix. Yeah, yeah, I have it. Okay, so the third paragraph, the first line I read, the information was not reviewed or was reviewed by our nurse case manager, and it does not change our decision. I'll read the rest of the paragraph. It says the results of the neuropsych examination indicated that your cognitive function, including all aspects of your memory ability, which sounds like what Dr. Payne said, are in fact, and that based upon your cognitive function, you are capable of performing occupational activities. So that's their determination now. But I guess I go back to Judge Jordan's question before, that cognitive impairment wasn't an issue. It was always concluded across the board that he was cognitively impaired. Yeah, what's the, I guess they're saying to us, this just misses the point. Nobody said he couldn't think. They said he couldn't function because he was severely depressed, and Dr. Payne's report doesn't speak to that at all. It just addresses something that nobody was ever disputing. First, Your Honor, cognition was clearly an issue. The claim was based upon confusion, psychotic thoughts. I mean, you know, I'm not a doctor. I'm not a psychiatrist, but that all relates to cognition. Can he think clearly? Can he make decisions? The decision-making was noted as severely impaired. So cognitive function is clearly a part of that. What's more, Dr. Panza clearly does say that his cognitive function, well, I can't say it as eloquently as Dr. Panza said it. He said at page 357 of the joint appendix, he said, Robert Plunk's cognitive functioning, including every measured aspect of his memory ability, is intact. Thus, there is disparity between self-support, et cetera. He goes on to say that Mr. Plunk was pleasant and cooperative throughout this examination. An appropriate amount of effort was applied to all tasks without any signs of frustration. There was no noted tendency toward mental fatigue, which was a noted limitation initially. Distractibility, noted limitation. Impulsivity, noted limitation. Or lapse in concentration, which was also severely impaired on the initial claim. So clearly, Dr. Panza's report said much more than Mr. Plunk would have you believe it said. And I commend it to the court's reading. I think based upon Dr. Panza's report alone, the claim determination is at least reasonable if not entirely correct. And I would reiterate, as the court is aware, even if your honors believe that, I'm sorry, I'm over my time, but even if the court believes that it was ultimately incorrect, if it's reasonable, and you feel like some reasonable minds could differ, then it should be upheld. Thank you, counsel. Thank you for the excellent briefing and argument, and we'll take the case under advisement. Last case today is Shahaza v. Attorney General. I probably got the pronunciation wrong. Thank you. You may proceed. Good morning. Good morning. Tanisha Maskey-Mesley, and following T.C., pro bono counsel for Zahra Shahaza. And with me today are pro bono co-counsel, Lindsey Granfield, and Alita Lasker at the table from Cleary Gottlieb, Stephen Hamilton. Your honors, I would request that I be allowed to reserve three minutes of my time for rebuttal. That will be granted. Thank you. May it please the court. We are here today because without this court's intervention, Mr. Shahaza would be forced to re-litigate removal proceedings in the face of no new evidence whatsoever, and years after the Board of Immigration Appeals reviewed this exact same record and upheld the immigration judge's asylum grant. Was there a real prejudice to just letting the process, I mean, I know it's one of the arguments your co-counsel made. Is there a real prejudice to just letting it run its course? You get a chance to litigate, and you can always appeal to this court at the very end. Your honor, absolutely there is real prejudice here, and Mr. Shahaza has already been through the removal process. He's already litigated fully his case, and he won. He won years ago. His case became final years ago. The BIA had the opportunity to review the exact same record that it had now reopened in the face of no new evidence whatsoever, and it absolutely would be a prejudice to Mr. Shahaza to force him to re-litigate after his case has become final, especially when there is a presumption in the law and in the BIA's own regulations that there is finality in decisions. So one of the chief issues in this case regarding habeas is whether your client is in custody. I think we all understand that that doesn't necessarily mean you have to be incarcerated, so maybe you can move to that. Yes, your honor. The district court erred in holding that Mr. Shahaza did not meet the in-custody requirement because he was not in physical detention, and that's something that the government doesn't even contest. The standard here is whether or not Mr. Shahaza is subject to restraint on his liberty, not suffered by the public generally, and the facts and circumstances of this case show that he is. Well, wouldn't the limit of your argument be, let me make sure I understand. Mr. Shahaza, am I saying it right? Yes, your honor. Mr. Shahaza, his only restraint, as you say, is that he's got to show up for court hearings, right? Respectfully, your honor, that is not the only restraint. Well, also that he has to let people know if he changes his address within five days? I mean, that doesn't really impede his movement, does it? Well, your honor, there is also the additional restraint on Mr. Shahaza by virtue of the fact that he was previously detained by immigration authorities, that he is subject to being re-detained at any time, for any reason, by the Immigration and Customs Enforcement Agency. So anybody who's ever been detained previously is in custody? Your honor, to the extent that they are in proceedings, and to the extent that they are still subject to, as Mr. Shahaza is, to the regulation, to ICE's regulation stating that they can be re-detained at any time, and that would satisfy what the government has stated as an eminency requirement, that yes, that they would satisfy the in-custody requirement for purposes of habeas jurisdiction. And I think if you look at Mr. Shahaza's case in total, this is a different situation, a need for restraints on him that would not be shared, that are not shared by the public generally, because it is not every day that the BIA reopens without any new evidence, and a final order that it made years previously. Sure, but that's not the argument. The argument you're making goes way beyond his specific case, which I guess is why I'm a little surprised that you're pressing it this hard. I mean, it occurred to me that you've got the declaratory relief position you can take. Perhaps you could say under the Administrative Procedures Act, you've got all by itself right there. You've got a federal question jurisdiction argument that you could be making. I'm wondering why you're leaning so hard on in-custody when the ramifications of what you're asking for go substantially beyond Mr. Shahaza's case, and if we were to say the things you would like us to say, would in all likelihood be cited back to us by criminals saying, hey, I've got to show up for my preliminary hearing. I'm really in custody. I've got a habeas petition I want to file. I mean, aren't you pushing us out on a limb where you really don't need to push us? Your Honor, respectfully, I don't think that we're asking the court to go out on a limb. Specifically, we've cited cases from the district courts in California where the restraints were strikingly similar to those that Mr. Shahaza is subject to at this time, specifically the Sheikh case and the Sandoval-Bella case. It would not be a stretch for this court to look at the facts of this case, especially considering the fact that habeas is not overly formalistic and that it is designed when there are potential miscarriages of justice to prevent those miscarriages of justice. It would not be asking this court to extend custody to everyone if we were simply to look at the facts of Mr. Shahaza's case and see that it fits within case law with which the government doesn't even disagree. If we, for sake of argument, didn't see it the way you saw it, is the case over for you on this in-custody piece? Your Honor, our case is not fully contingent on our petition for habeas corpus. We also have outstanding prior score relief under declaratory judgment and a writ of mandamus which the court below did not address. So why don't you, if you wouldn't mind, why don't you shift to the argument that even if there were a basis in habeas or in one of these others that could arguably exist, that 1252B9 and 1252G just knock you right out. Yes, Your Honor. I'll take 1252B9 first. 1252B9 does not preclude Mr. Shahaza's case because it only applies where there is a final order of removal. And to hold otherwise in this case would mean that the BIA could reopen on a whim at any time without any individual ever having recourse. What happened to Mr. Shahaza here is that, again, his case was final in 2004 after the BIA reviewed the exact same records, and now the BIA has reopened his case. Is your argument that under 1252B9 you may come to this court, as a jurisdictional matter, you may come to this court after a final order and because there was a final order at one point, you're free to come here now? Is that it? Your Honor, looking at this case, the facts and circumstances of this case, we would submit that yes, essentially, because Mr. Shahaza has fully litigated his case, because he had a final order and the BIA reviewed this exact record, that this is the type of case that judicial review was meant for, because without it and without federal court intervention, Mr. Shahaza potentially is going to be forced to litigate his case over and over and over again unless he loses. And that can't be the result that Congress envisioned or that court envisioned. So to put it simply, Your Honor, 1252B9 doesn't apply to Mr. Shahaza's case. What about 1252G, where it says the Attorney General's decisions about adjudication? Or commencing proceedings, for that matter. I will address them both. Under 1252G, first of all, Mr. Shahaza's case, this is not a commencement of actions. The regulations, the BIA's regulations state that an action can only be commenced, removal proceedings can only be commenced through a notice to appear, and that is clearly not the case here. This is a reopening of prior proceedings, so it puts Mr. Shahaza back in the place where he was previously. In addition, this is not an adjudication of Mr. Shahaza's case. What we're trying to prevent here, the harm that we're trying to prevent, is the re-adjudication of Mr. Shahaza's case. But isn't the purpose of 1252G regarding that commencing proceedings, isn't the purpose to preserve prosecutorial discretion about whether to pursue removal or not in a particular case? Yes, Your Honor. Why shouldn't that apply here? It doesn't apply here, Your Honor, because it would be a different circumstance if Mr. Shahaza hadn't litigated his case or if he had lost. But Mr. Shahaza fully litigated his case. He won a grant of asylum. The BIA reviewed the record, the exact same record as before it now, and the BIA upheld the immigration statute decision. And in point of fact, the immigration, INS at the time, abandoned this appeal. But what we have here... It can't be the commencement of an action because it's the same action, right? Correct, Your Honor. It is the same action. It's reopened. The proceedings have been reopened. But what about adjudication? I mean, there's that separate part of 1252G where the statute says, hey, if the Attorney General decides to adjudicate something, not to put too fine a point on it, of course you guys butt out. Your Honor, this is not... The three areas that are covered by 1252G have been held by the Supreme Court to be very narrowly read. And Mr. Chahab's case simply does not fall within that purview. The BIA has regulations for a reason, and they have regulations specifically governing when a case can be reopened and when a case shall not be reopened. And that is one of the issues here. ICE brought a motion to reopen, and ICE was subject to the BIA's regulations that said a motion to reopen shall not be granted unless there is new material evidence that was not and could not have been discovered previously. And ICE failed to meet that standard, and so it was incumbent upon the BIA to deny that motion. Instead, what the BIA did was the BIA improperly invoked a two-response authority to reopen Mr. Chahab's case when the BIA had already reviewed the exact same record. Sure. And we know what the facts are, but you said the Supreme Court has defined that very narrowly. Why don't you tell me about that? Tell us about that. What is it that the Supreme Court said that would cause us to read that in a limited way? Well, I think, Your Honor, I think with respect to adjudication of cases, according to the Supreme Court, the 1252G was created to prevent, for example, interlocutory appeals that might arise to contest the way that proceedings were being conducted. That is not the case here. Mr. Chahab's case has already been litigated, it has already been adjudicated, and what we have come before this Court for and have sought relief for is to prevent the re-adjudication of his case when his case was already final. And I think that is one of the key things that we have to keep in mind. This case was final. The BIA reviewed Mr. Chahab's case and actually had the noble review authority to review his case. The BIA had from 2002 until 2004, it looked at his case on the exact same record. The government doesn't contest that there are no new facts alleged. And the BIA looked at this case and it said Mr. Chahab's asylum grant should be upheld. And the BIA should be held to its own regulations. ICE was required to follow the requirements for reopening under the BIA's regulations, and the BIA should not be able to circumvent those regulations and abuse discretion by invoking its response authority. I have one more question if my colleagues will indulge me. Yes. You make much of the BIA having a standard for reopening, and that it has to be exceptional circumstances. And my question to you is, since one of the things the BIA said was, it appears to us that the immigration judge was not impartial. Would that not be an exceptional circumstance to have a decision maker who was apparently not impartial making a decision? If the BIA had a basis for saying that, would that not fit the BIA's own standard of exceptional circumstances? Respectfully, Your Honor, there is no way in this case, looking at the circumstances of this case, that the BIA's explanation that there was somehow bias on the part of the immigration judge could possibly, in this case, possibly constitute an exceptional situation because that's actually one of the basis for the appeal. Hold up, you're answering a different question. My question to you is not whether they're right that she was biased, but whether, as a legal matter, it would constitute an exceptional circumstance if there were a biased decision maker below. Your Honor, I can't speak to every situation, and I think it would depend on the facts and circumstances of that case and what the BIA has said about whether or not it constitutes an exceptional situation. But what I will come back to is that... This judge wasn't. I understand. Your position is this judge wasn't. That's clear. And it was also raised below. The BIA had that and reviewed that case back in 2002, between 2002 and 2004. Thank you. Good afternoon. I'm going to please the Court. Erez Urvani on behalf of the athletes. How do you say your name, sir? Erez. E-R-E-Z. Erez Urvani. R-E-U-V-I. E-R-U-V-A-N-I. Urvani, yes. Your Honors, this case raises important threshold questions about the enforcement of the Immigration and Nationality Act. There are four separate jurisdictional hurdles, each of which alone, if a penalty fails to be satisfied, kicks this case out of federal court on a jurisdictional basis. I'd like to begin, although the Court below focused on behaviors with Section 1252b-9 and Section 1252g. It's important to understand that those amendments to the INA in 2005, I believe, affected a sea change in the application of habeas corpus release in removal proceedings. Prior to 2005, the habeas proceedings occurred in tandem with appeals to the Federal Courts of Appeals, and such piecemeal litigation occurred in removal proceedings. In this court, in Bonamentra, 2005, discussed that the whole point of the amendments was to end the piecemeal litigation, that there would be one bite of a streamlined apple, so to speak, in the Court of Appeals after a final order of removal. The appellants looked to Section 1252b-9 and 1252g, suggesting that there must be a final order of removal before those provisions kick in. Well, that's what the Supreme Court said in St. Cyr, isn't it? Respectfully, St. Cyr is a pretty reliable case. Applying to a regime that still allowed habeas review for removal proceedings piecemeal prior to a final order of removal. Well, nothing in the 2005 amendments changed the point about 1252b-9. I mean, 1252b-9 and 1252g weren't amended in 2005, were they? Respectfully, they were. They were specifically amended to strip the Court of Appeals. I apologize. There was the addition of the habeas paragraph in 1252b-9. That's right. But 1252g was not, nor was the other language in 1252b-9, right? I believe. I'm unsure about 1252g, but our argument wouldn't depend on that. 1252g combined with 1252b-9. So, assume there's no, we agreed with you about they're not in custody. We're talking about some other jurisdictional basis, either the 8th day or the Declaratory Judgment Act. So, we're not talking about habeas, really. We're talking about general jurisdictional issues here. What is it about the 2005 amendments that changes this statement in St. Cyr? Quote, its purpose, that is, 1252b-9, is to consolidate judicial review of immigration proceedings into one action in the Court of Appeals, but it applies only with respect to review of an order of removal. What's different is that in 2001, is that when St. Cyr was making that statement? Yeah. Individuals could still go to the district court, challenging removal proceedings during those removal proceedings or even at the end of removal proceedings before going to the Courts of Appeals. I'm not following your logic because this court is not speaking to whether or not they can go to the Court of Appeals directly or not in the context of this statement. This statement is reflecting what the Supreme Court says 1252b-9 means when it says you have to interpret it in light of 1252b. If you've got to interpret it in light of 1252b, that's as true today as it is in 2001, isn't it? Respectfully, no. In 2005, what the REAL-ID Act did, and this is in the legislative history, it's discussed in the Aguilar case, which is the most thorough treatment of the issue that we refer to on our briefs outside of the First Circuit. What the REAL-ID Act sought to do is to preserve habeas solely for one type of cause of action, where the individual is contesting the conditions of their physical custody. That's in the legislative history, that's in the Aguilar case, but after 2005, what needs to occur, what Congress envisions, is the aliens challenging the removal proceedings. When it goes through the removal process, the Aguilar court referred to this as administrative exhaustion. This court has referred to it as jurisdictional exhaustion in a pre-REAL-ID case as well. But either way, what the REAL-ID Act did is not strip the courts of jurisdiction.  What it sought to do was end claim splitting between piecemeal litigation at the habeas level of the district court and on appeal after a final order of removal. What it does is channel all claims to the courts of appeals after and only after a final order of removal. Until that final order of removal occurs, they won't exhaust their reliefs. How can it be the case that, or maybe it's better for me to ask it this way, are you not making an argument then that this is the type of thing which is beyond judicial review? It's capable of repetition yet evading review, right? I don't believe so, Your Honor. This is reviewable, without a doubt, but not at this stage in litigation. That misses what their argument is. Their argument is not that, hey, I'm not subject to a removal proceeding. It's, hey, I had a removal proceeding, and there's no reason, and I have a final order. And it's a final order in my favor. And, therefore, to put me back in the cycle, for no reason except they can, is to effectively say they can keep doing this to me forever until they find an IJ they like and that that can't possibly be what the Congress had in mind. Now, you say, and I think there's more than a little irony in this, appellant is scheduled to appear before an immigration judge for his removal proceeding April 27, 2011. At that time, he may address the issues, et cetera, and, quote, that will end the matter. By your logic, it won't end the matter by any stretch, because if the IJ says the same thing that was said last time, you can go back and do it again, right? And if the IJ after that says it, you can go back and do it again, right? Respectfully, absent some showing on the record that there's irregularity on the administrative level, we take the board and the IJ at their word and assume that they're acting in good faith. They'll be able to go before the IJ. Answer my question when you say I didn't suggest that they weren't acting in good faith. I'm just saying by your logic and as your opponents argue, there's no end to that cycle, is there? Logically, there's no end to that. No matter how good faith they're acting in, if they want to keep doing it, they can keep doing it, right? There can never be finality. This is theoretical more than practical in the sense that what will occur here is the new issue that was raised by the DIA, whether there was unfairness in the proceedings and whether pursuant to the affidavit that was submitted before the board with ICE's motion, which was later relied on to respond to the reopening, that this particular individual, they could not determine whether this person was a national security threat at that time. These are the things that will be reviewed and litigated before the IJ then goes up to the board and then will come here and appeal. So you're saying, if I'm hearing you right, you're saying that logically there's not an end to this process, but don't worry because we wouldn't do that. No, I don't think so. I can see the argument being made, but if there was nothing new at all in the record, which we dispute can be reviewed on a suicide type case under the circuit's precedent, but if there was nothing new, that may be a concern. There is, in fact, new material here, which although may not be... Is it a seal or something? It's what was in the affidavit that was submitted in 2007 by an FBI agent in which they stated, despite the five years of review, they cannot at this time determine whether this individual is, in fact, a national security threat or not, such that he could not pursue adjustment at this stage, he cannot naturalize, and so on. That was all information, according to your opponent on the other side there, that they had before, and I read Agent Alicia's affidavit, and I was having a hard time seeing something that wasn't said before. Is there something new in his affidavit that wasn't said before, or is it just a different conclusion? I believe what they considered new is this conclusion that they at this time cannot determine this individual is not a national security concern. How can one ever disprove a negative? I mean, if the FBI comes back and says, the information is the same, but we can't say there's not a security threat, is there any response that a person can make to that? In the removal proceedings, should they occur, the government will be held to its burden to meet that assertion. They won't just rely on the simple, I said so, therefore we win. They're going to require the fore and neutral arbiter to present evidence that neutral arbiter will reach factual conclusions, the board will review those factual conclusions, and then we'll be back in federal appellate court, if necessary. But the entire, short-circuiting that entire process, and this is the whole point of the 1252B9 and 1252G amendments to the INA and the Real ID Act, there's a time and a place under those amendments for these claims. That time and place is before the IJ, then before the board, then before this court on appeal. And if I may move for a moment to the sua sponte question. The appellants appear to ascribe some sort of questionable motive to the BIA, that they may reopen and reopen and reopen and act in this infinite loop that you just alluded to, Your Honor. We presume that the agency acted at their word, there's a presumption of regularity. What they've done here under this circuit, and there's many cases in this circuit on the subject, absent two limited exceptions that don't obtain here, that issue is not reviewable in federal court. Well, you ought to respond to your opponent's argument in briefing that every case you've cited is a case in which our court or another court has said we can't review a decision not to reopen sua sponte, and that that's functionally different from a decision to openly sua sponte, specifically citing Heckler v. Cheney and the discussion in there about the difference between a court acting and a court not acting. So why don't you address that point? They say you have no case on point because they're all on the negative side, none of them in a circumstance where the BIA acted. What's your argument? I will respond to that in two ways. First, in subsequent 28-day briefing in letter form, we submitted a case, Suarez 2008, unpublished decision that addressed the affirmative granting of reopening as opposed to the denial of sua sponte reopening. Second, we addressed the party that addressed this in a second 28-day letter, the Plumy case, briefing case out of the Third Circuit. Brilliantly written, right? Brilliant. Judge Jordan's opinion. Well, we like the case. I kind of like the case as well. The case there discussed the general proposition that reopening, whether it's granted or denied, is not subject to judicial review. What occurred in the Plumy case, the court addressed a limited exception. Was there a legal error? Did the board misunderstand the legal scope of its discretionary authority? If that is the case, the court has limited jurisdiction to address the scope of the correct legal authority and remand for the board to exercise that authority. But, and if I may quote from there, or I guess I'm paraphrasing here, on remand, the BIA would be free to deny or grant reopening sua sponte, and we would have no jurisdiction to review that. Well, let me ask this. Is there not a difference? When you say there's no jurisdiction to review a denial, that's always in the context of, has been said in the context of we don't have any standard to measure that against. Here there is a standard, as your opponent is saying. It's the exceptional circumstances standard. Doesn't that make a reasoned difference, a reasoned distinction? Of course, Tizian and Plumy speak to that as well. There is this language, exceptional situation, that appears in four decisions discussing the standard for reopening. It doesn't appear in the regulation. It's a construct of the board in applying its authority. But it's got the force and effect of law in the sense of it is a standard by which the board acts, right? Well, that's right. And if I may refer to Plumy again, there the court identified only one situation in which exceptional circumstances had been articulated in a consistent case-by-case manner in which the court could reasonably find that the BIA had cabined its discretion under that standard and provided a meaningful standard for the court to apply. That's in the board's decision of Inree Pickering, which addresses an aggravated felon's removal when his underlying conviction has been overturned in the duration of his removal proceedings. Because there, there is a standard to apply because the board has provided one case after case. This falls in the general principle in administrative law, where if the agency cabins its discretion that's otherwise discretionary, then a deviation from that is reviewable. You may remit to the board to explain the discrepancy from previous practice. What's the backstop? Is there any backstop at all, Mr. Ruveni, to the infinite loop? Is there a due process argument that can be made? And if so, at what juncture would a person make it? I guess I'm going back to a question I've asked before, but I don't feel like I've understood your answer. Is there no point at which an immigrant could say, hey, they're just not treating me fairly, make them stop? We believe that point, again, is in the removal proceedings, where there will be an evidentiary hearing where the government will be put to its burden and be forced to represent what it claims are these national security interests. That can be done in camera. That can be done in testimony. Yeah, but isn't that going to break the, I mean, the petitioner here already is, I mean, he's got some problems with bets and all. I mean, eventually you'll run out of money. You won't be able to defend yourself, right? You keep having to go through this exercise. So there's got to be a final point, right? Well, every point of finality must be reached. I don't believe it appears here in this case. You have to figure that out, though, right? I mean, you seem to be making the argument that, yeah, there's no end in sight, but don't worry about that. And I guess I'm trying to figure out if I'm understanding that argument right. If that really is your pitch, if your argument is, it's true, this could go on forever, but don't worry, we wouldn't let that happen. Certainly, that's your paraphrasing of our argument. I wouldn't say it's... What is the end point, then? I've heard you say we have to presume they'll act in good faith, but that's the only thing I've heard you say in this regard, and that sounds to me like trust us, and that's what I'm trying to belly up to is if it's true that your position is, yes, as a logical matter, this could go on forever until the BIA gets it to an IJ who will rule against them. As a logical matter, that's true, but don't worry about it. Then that's all I want to hear you say. If that's your position, that's your position. But if you've got a reasoned argument for why that isn't a risk, I really want to hear it. Generally, when an accusation is made that they're acting in bad faith, that they're doing something for ulterior purposes, that they're not doing what they're supposed to be doing in a fair and consistent manner, we can find that in the record. We point to it. We look for it. Until that point has been reached, the concern about an infinite loop isn't just a theoretical concern. Once that point is reached and he comes back to the Court of Appeals and says, Look, we presented our case. We have the evidence here. This is an incorrect legal premise. Then that's your backstop, but we haven't reached that point yet. That's our backstop. How would they raise it? I guess that's what we're going back over, and I don't mean to try my colleague's patience or yours, but how did they raise it? Because your argument is you don't have jurisdiction to look at that ever. At this point. Well, at what point? Assume this went four or five iterations down the road. What would prevent your colleague from, named justice, coming up here three years from now, four or five iterations down the road and saying, Well, you still don't have jurisdiction to look at for the same reason we told you back in 2011? Let me compare it by analogy, because I'm going to say I'm over my time here, to say other non-final orders that occur in the removal process, a decision to reopen, a decision to appoint counsel, decisions that are not immediately reviewable and are only reviewable once the administrative process, articulated by 1252B9, 1252G, and the court's general exhaustion doctrine is exhausted. Once that's all taken care of here, the court will be able to, on a new, fresh record where this new evidence is tested, reach that decision. If there are no more questions. Thank you. Thank you. Could you tell us, as a practical matter, why your adversary's response to Judge Jordan's question is wanton? Yes, Your Honor. The reason that we're here is because Mr. Chiazza has already been through the process that the government speaks of. The government would now have Mr. Chiazza go through these removal proceedings again, and the only justification for that is, well, the government can meet its burden this next time. But what we need to do here is we need to look at the circumstances of this case and what happens, as the court is rightly concerned about, if there can never be an end to removal proceedings in the event that someone wins and prevails, and in the event that, to the extent that there is a motion to reopen that is brought by the government, that the government is not held to the same standards as an alien would be held to if they brought a motion before the court for reopening. That is what this case is about. Mr. Chiazza has been through removal proceedings. He was granted asylum in 2002. The government appealed. The government, I would also highlight, Your Honor, is that at the time, one of the bases for Mr. Chiazza's granted asylum was actually the security grounds, the 9-11 security grounds that the government now says is a reason that they can't rule out Mr. Chiazza as a national security risk. Mr. Chiazza voluntarily came forward to offer information about the 9-11 hijackers. And then he was detained, right? And he was detained as a material witness and then released. And in the IJ's decision, the immigration judge said, the FBI has found that you are not a danger, you are not a national security risk, and we thank you for coming forward. So that was fully litigated. Those facts were known. And as the court rightly points out, there is nothing in Agent Alicea's affidavit that shows that these facts were not known and could not have been discovered previously. There is nothing new or material here, either with respect to alleged national security threat posed by Mr. Chiazza or in terms of misrepresentation, which was the other basis of the government's motion to reopen. The bottom line here is that all of this was laid bare, not only before the immigration judge, but by the Board of Immigration Appeals. The Board of Immigration Appeals had de novo review power over Mr. Chiazza's case, and it chose on the record, the exact same record, to uphold the immigration asylum grant. ICE did not meet its burden, and to the extent that this case is allowed to go forward and Mr. Chiazza is forced to relitigate his claims once again, that will send the message that no matter if you prevail, no matter how long it's been, if the BIA, if ICE can't meet its burden, the BIA can step in, the BIA can invoke and co-respond to the authority, thereby insulating its decision from review, and you will have no recourse, you will have no choice but to be that hamster on the wheel again and again and again, perhaps. So what we ask this court is that Mr. Chiazza has shown, whether it be through habeas corpus, whether it be through declaratory judgment or writ amending, that Mr. Chiazza has shown that his case is properly before the federal courts for review, and we respectfully request that this court reverse the district court's ruling and remand for a decision on the merits. Thank you. Thank you, Counsel. We thank Counsel for their excellent briefing and argument, and we'd like to especially recognize Counsel for Appellants, who took this case pro bono. They did an excellent job, and the court is especially appreciative of folks who come forward to render pro bono service, so thank you so much for doing that. The clerk will adjourn court. Thank you.